Ron Kilgard (State Bar No. 005902)
Mark Samson (State Bar No. 011076)
KELLER ROHRBACK, P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, Arizona  85012
Tel:     602 248 0088
Fax:     602 230 6360
Email: Rkilgard@KRPLC.com
        Msamson@KRPLC.com

Attorneys for Plaintiff
*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe, on behalf of herself and all others similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>ARIZONA HOSPITAL AND HEALTH-CARE ASSOCIATION; AzHHA SERVICE CORPORATION; BANNER HEALTH; UNIVERSITY MEDICAL CENTER CORPORATION; CARONDELET HEALTH NETWORK; JOHN C. LINCOLN HEALTH NETWORK; REGIONAL CARE SERVICES CORP.; NORTHERN ARIZONA HEALTHCARE CORPORATION; TMC HEALTHCARE; SUN HEALTH CORP.; CATHOLIC HEALTHCARE WEST; YUMA REGIONAL MEDICAL CENTER; NAVAPACHE HEALTH CARE ASSOCIATION INC.; and SCOTTSDALE HEALTHCARE, CORP.<br><br>            Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.    Plaintiff Jane Doe[1] ("Plaintiff"), a Registered Nurse who works as a per diem nurse, brings this Class Action Complaint based on personal knowledge as to matters relating to herself, and based on the investigation of counsel and on information and belief as to all other matters, against Defendants Arizona Hospital and Healthcare Association, its subsidiary the AzHHA Service Corporation (collectively, "AzHHA"), and certain conspiring hospitals named above (the "Hospital Defendants") (collectively, "Defendants") to recover damages arising from years of suppressed wages, and to restrain Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402, interference with business expectations, unfair competition, and unjust enrichment.

2.    AzHHA is an association or organization of hospitals and healthcare systems, and includes as members the Hospital Defendants.   AzHHA runs a group purchasing arrangement referred to as The Registry Program (the "AzHHA Registry" or the "Registry"), that has, in fact, operated as an illegal buyers' cartel, to the detriment of Plaintiff and other similarly situated nurses.

3.    The Registry contracts with various nursing agencies to provide temporary per diem and traveling nursing services for most of the hospitals in Arizona, including the Hospital

---

[1]"Jane Doe" is a pseudonym, being used out of a reasonable fear of retaliation that would threaten Plaintiff's livelihood.  *See Doe v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-73 (9th Cir. 2000) (permitting pseudonymous suits when nondisclosure of the party's identity is necessary, *inter alia*, to protect a person from harassment or injury, and reversing the district court's decision to the contrary as an abuse of that court's discretion).

Defendants.  Through the Registry, AzHHA, the Hospital Defendants, and additional, unnamed conspiring hospital members of AzHHA ("Participating Hospitals"),  have jointly suppressed and lowered wages paid to Plaintiff and other similarly situated nurses who have worked for the Hospital Defendants, and for other Participating Hospitals. Plaintiff and other nurses have been paid less, and are being paid less, than they otherwise would have been paid or would be paid, but for the anticompetitive conduct of Defendants.

4.      Through the Registry, Defendants jointly set – and wrongfully suppress – the wages paid to temporary nurses at hospitals throughout Arizona.

5.      Defendants accomplished this by, *inter alia*, setting and agreeing on  prices (or bill rates) and other material terms between nursing agencies, through which the Hospital Defendants and the Participating Hospitals obtained the services of temporary per diem and travel nurses, and the Hospital Defendants and other Participating Hospitals.  The purpose and effect of this joint conduct was to lower the wages paid to these nurses.

6.      Most of the monies received by nursing agencies in the form of their bill rates are passed directly to nurses as wages and benefits.  Bill rates and nurse wages are directly correlated: when bill rates rise, so do wages, and vice versa.

7.      When AzHHA started the Registry in 1988, it focused, at first, on setting uniform quality standards for per diem and travel nursing personnel, and enforcing those standards through regular audits.  During this time, AzHHA allowed each participating agency that placed per diem and travel nurses to set its own bill rates, provided that the agency offered the same rates to every hospital participating in the Registry.

8.     Prior to the mid-1990s, there was no "prevalent" billing rate for per diem and travel nurses.  Hospitals and staffing agencies negotiated wages for those nurses based on a variety of factors, and rates differed accordingly.   In this environment, there was competition between the nurse staffing agencies and hospitals for the employment of per diem and traveling nurses, and  per diem and traveling nurses' wages were set by market conditions.

9.     Beginning in 1997, however, AzHHA began imposing the same or uniform bill rates on each participating agency, rates the agencies had to offer to each hospital participating in the Registry.   Through the AzHHA Registry, Defendants and other Participating Hospitals agreed to, and did, set uniform bill rates and other contract terms for the purchase of traveling and per diem nursing services from nurse staffing agencies.

10.    Acting collectively on behalf of most of the hospitals in Arizona, AzHHA has set bill rates – and therefore, nurse wages – below the levels that the Hospital Defendants and other Participating Hospitals could otherwise have achieved by negotiating independently with each agency to employ nurses.   AzHHA also has imposed other noncompetitive contractual terms on participating agencies.

11.    The contracts between Defendants were mutually beneficial to Defendants.   AzHHA reaped a 2% monthly fee, ostensibly for administering the Registry, on the wages paid to nurses.   That fee accounts for a major portion of AzHHA's annual revenues and motivates AzHHA to perpetuate and expand the Registry.   The Hospital Defendants (and the Participating Hospitals) participate in the Registry because it produces reduced billing rates for nurses, and therefore reduces what the Hospital Defendants and the Participating

Hospitals pay for temporary nursing services. This symbiotic relationship caused the Registry to grow and flourish at the expense of traveling and per diem nurses, whose wages were depressed.

12.   Efficiencies do not explain or justify Defendants' conduct.  Agencies have not obtained significant transactional efficiencies or scale economies as a result of the imposition of uniform bill rates.   The imposition of uniform bill rates has not been reasonably necessary to achieve any benefits, such as greater quality assurance.  Neither agencies nor hospitals have acted as though the setting of uniform rates by the Registry creates efficiencies.

13.   Defendants' anticompetitive conduct was first publicly revealed in a pending suit brought by PC Healthcare Enterprises, Inc., an agency that places nurses for employment, against AzHHA and a number of Participating Hospitals, including some of the Hospital Defendants.  *See PC Healthcare Enterprises, Inc., dba Health Temp v. Arizona  Hospital and Healthcare Association, et al.*, No. CV-05-1793-PHX-MHM (D. Ariz).

14.   Through the instant suit, Plaintiff seeks to recover for years of suppressed and lowered wages resulting from Defendants' wrongful conduct, on behalf of herself and a class (defined below) of other similarly situated persons, and asks this Court to enter injunctive relief to prevent further violations of the federal antitrust and state laws.

15.   On May 22, 2007, the United States Department of Justice (the "DOJ") filed a complaint against AzHHA.  The DOJ alleged that the conduct of these Defendants – conduct substantially similar to the conduct alleged herein – violated the Sherman Act and the Arizona Antitrust Statute.  *See United States of America & the State of Arizona v.*

*Arizona Hospital & Healthcare Association & AzHHA Service Corporation*, No. CV-07-1030-PHX-JAT (May 22, 2007 D. Ariz.) ("DOJ Complaint"), available at http://www.usdoj.gov/atr/cases/f223400/223477.htm.  On the same date, the DOJ filed a proposed final judgment whereby AzHHA agreed to cease certain of the unlawful activities alleged below.  *United States of America & the State of Arizona v. Arizona Hospital & Healthcare Association & AzHHA Service Corporation*, No. CV-07-1030-PHX (May 22, 2007 D. Ariz.) ([Proposed] Final Judgment), available at http://www.usdoj.gov/atr/cases/f223400/223474.htm.  However, the DOJ Complaint was limited and much of the conduct alleged herein was not ceased or remedied.

## PARTIES

16.     Plaintiff is a Registered Nurse and has worked as a per diem nurse in Arizona for a number of years at one or more of the Hospital Defendants, at which her wages were depressed due to Defendants' scheme.

17.     Defendant ARIZONA HOSPITAL AND HEALTHCARE ASSOCIATION is a nonprofit corporation existing under the laws of the State of Arizona and headquartered in Phoenix.  The association describes itself as dedicated to providing leadership on issues affecting the delivery, quality, accessibility, and cost effectiveness of healthcare.  Active members of the association include more than 100 hospitals and health systems in Arizona.  Executives from member hospitals control the board of directors of the association.

18.     Defendant AZHHA SERVICE CORPORATION is a for-profit corporation existing under the laws of the State of Arizona and is a wholly owned subsidiary of the Arizona Hospital and Health Care Association;  it is also headquartered in Phoenix.  AzHHA

Service Corporation runs the AzHHA Registry, which assists member hospitals purchase the services of temporary healthcare personnel, including per diem and travel nurses. Executives from Arizona Hospital and Health Care Association member hospitals control the AzHHA Service Corporation Board of Directors.

19.     Defendant BANNER HEALTH ("Banner") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 1441 North 12th Street, Phoenix, Arizona 85006.  Banner owns and operates a number of hospitals and medical centers in the greater Phoenix and is the largest such entity in Arizona.

20.     Defendant UNIVERSITY MEDICAL CENTER CORPORATION ("University") is a corporation existing under the laws of the State of Arizona with its principal place of business at 1501 North Campbell Avenue, Tucson, Arizona 85724-5728.   University owns and operates University Medical Center, in Tucson, Arizona.

21.     Defendant CARONDELET HEALTH NETWORK ("Carondelet") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 2202 North Forbes Boulevard, Tucson, Arizona 85745.  Carondelet owns and operates Carondelet St. Joseph's Hospital, Carondelet St. Mary's Hospital, and Tucson Heart Hospital, all in Tucson, Arizona.

22.     Defendant JOHN C. LINCOLN HEALTH NETWORK ("Lincoln") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 250 East Dunlap, Phoenix, Arizona 85020.  Lincoln owns and operates John C. Lincoln Hospital - Deer Valley and John C. Lincoln Hospital - North Mountain, both located in Phoenix, Arizona.

23.     Defendant REGIONAL CARE SERVICES CORPORATION ("RCS") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 1800 East Florence Boulevard, Casa Grande, Arizona 85222-5399.  RCS does business as Casa Grande Regional Medical Center in Casa Grande, Arizona.

24.     Defendant NORTHERN ARIZONA HEALTHCARE CORPORATION ("NAH") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 1200 North Beaver Street, Flagstaff, Arizona 86001-3198. NAH owns and operates Flagstaff Medical Center, Inc., in Flagstaff, Arizona and Verde Valley Medical Center in Cottonwood, Arizona.

25.     Defendant TMC HEALTHCARE ("TMC") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 5301 East Grant Road, Tucson, Arizona 85712.  TMC owns and operates Tucson Medical Center, Inc. in Tucson, Arizona.

26.     Defendant SUN HEALTH CORPORATION ("Sun Health") is a corporation organized and existing under the laws of the State of Arizona with its principal place of business at 13180 North 103rd Drive, Sun City, Arizona 85351.  Sun Health owns and operates Sun Health Boswell Hospital and Del E. Webb Sun Health Hospital, both in the Phoenix metropolitan area.

27.     Defendant CATHOLIC HEALTHCARE WEST ("CHW") is a corporation organized and existing under the laws of the State of California with its principal place of business at 185 Berry Street, Suite 300, San Francisco, California 94107.  CHW owns and operates Chandler Regional Hospital at 475 South Dobson Road, Chandler, AZ 85224-4230.

28.     Defendant YUMA REGIONAL MEDICAL CENTER, INC. ("YRMC") is a corporation organized and existing under the laws of the State of Arizona which owns and operates YRMC at 2400 South Avenue A, Yuma, Arizona 85364.

29.     Defendant NAVAPACHE HEALTH CARE ASSOCIATION INC. ("Navapache") is a corporation organized and existing under the laws of the State of Arizona which owns and operates Navapache Regional Medical Center at 2200 Show Low Lake Road, Show Low, Arizona 85901.

30.     Defendant SCOTTSDALE HEALTHCARE CORP. ("Scottsdale") is a private, not-for-profit corporation organized and existing under the laws of the State of Arizona headquartered at 7400 E. Osborn, Scottsdale, AZ  85251, which owns and operates numerous facilities in Arizona including: Scottsdale Healthcare Osborn; Scottsdale Healthcare Shea; and Scottsdale Healthcare Thompson Peak.

31.     Each of the Defendants named in Paragraphs 19-30 (collectively, the "Hospital Defendants") is a member of AzHHA, participates in the Registry, and is a co-conspirator that made statements and/or performed acts in furtherance of the price-fixing conspiracy alleged herein.

32.     Numerous other hospitals not named in this Complaint (*i.e.*, the "Participating Hospitals") participate in the Registry, have made statements and/or performed acts in furtherance of the price-fixing conspiracy, and are unnamed co-conspirators.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over the subject matter of this civil action pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337.

34.   Venue is proper in this, the District of Arizona, under 28 U.S.C. § 1391(b) and/or 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District, (b) Plaintiff resides in this District, and/or (c) a substantial portion of the events described below have been carried out in this District

35.   The Court has jurisdiction over the Arizona state law claims under the doctrine of pendent jurisdiction, 28 U.S.C. § 1367.

## DEFENDANTS' FRAUDULENT CONCEALMENT

36.   The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to fraudulently conceal their wrongdoing and because Plaintiff did not learn and, acting as a reasonable person with due diligence, should not have been expected to learn earlier of the existence of Defendants' wrongdoing.

37.   Defendants affirmatively misled Plaintiff into believing that her wages were true market wages set by the laws of supply and demand rather than the artificially depressed wages that resulted from Defendants' scheme.

38.   Defendants affirmatively required confidentiality surrounding the existence and terms of agreements between nursing agencies and AzHHA; and between AzHHA, the Hospital Defendants, and other Participating Hospitals.

39.   In part because wages are non-public and confidential, Plaintiff did not know, and, acting as a reasonable person with due diligence, should not have been expected to know that Defendants orchestrated a scheme to depress wages.

40.    Even with, and despite the exercise of, due diligence, Defendants' scheme to depress

wages could not have been discovered until at least 2005.

## CLASS ALLEGATIONS

41.    Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and

23(b)(3) on behalf of herself and the following class (the "Class"):

> All natural persons who have provided per diem or traveling nurse service in
> the state of Arizona for any Hospital Defendant or other Participating Hospital
> at any time from January 1, 1997, until the effects of Defendants'
> anticompetitive conduct cease (the "Class Period").
>
> Excluded from the Class are Defendants and their parents, officers, directors,
> subsidiaries, and affiliates.

42.    Members of the Class are so numerous that joinder is impracticable.  Plaintiff believes

that the Class includes many hundreds or thousands of per diem and traveling nurses.

43.    Plaintiff believes that final injunctive relief is appropriate to prevent any recurrence of

Defendants' anticompetitive behavior.

44.    There are numerous questions of law and fact common to the Class, including:

    a.    whether, and to what extent, Defendants' conduct caused the wages of per

    diem and traveling nurses to be artificially suppressed and lowered below

    competitive levels and thereby caused Plaintiff and other Class members

    to suffer antitrust injuries;

    b.    whether the per diem nurses market, and the traveling nurses market, are

    the markets relevant to this case;

    c.    whether Defendants conspired to artificially suppress wages for per diem

and traveling nurses; and,

d.    whether Defendants entered into agreements that unreasonably restrained trade in the per diem nurses market and the traveling nurses market.

45.    These and other common questions of law and fact predominate over any questions affecting only individual Class members.

46.    Plaintiff's claims are typical of the claims of the Class because all Class members suffered antitrust injury in the same way as a result of Defendants' wrongdoing, and the claims of each Class member arise out of the same essential facts and are based on the same legal theories.

47.    Plaintiff will fairly and adequately represent and protect the interests of the Class.

48.    Plaintiff has retained counsel experienced in class action antitrust litigation, and Plaintiff has no interest in this litigation that conflicts with the interests of the other members of the Class.

49.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty for the Court in managing the claims of the Class that would preclude class certification.

## TRADE AND COMMERCE

50.    Arizona hospitals employ various types of nursing personnel to treat and care for patients. Hospitals are the primary employers in Arizona of registered nurses ("RNs"), who must graduate from an approved professional nursing program to obtain a license in Arizona. Specialty RNs are RNs who receive additional education and training and become certified to practice in a specialty unit, such as critical care, neonatal intensive care, or

telemetry.  Specialty RNs and RNs account for most of the nursing staff employed by Arizona hospitals. Besides RNs and specialty RNs, Arizona hospitals employ several other types of nursing personnel, including licensed practical nurses ("LPNs"), certified nursing assistants ("CNAs"), operating room technicians, behavioral health technicians, and sitters.

51.     Arizona hospitals frequently cannot meet their nursing needs with their own regularly employed nurses.  Hospitals cannot meet their nursing needs because of, for example, temporary absences of the hospitals' regularly employed nursing staff, daily variations in hospitals' censuses, an influx of visitors to Arizona during the winter months, and a rapidly increasing state population.

52.     Consequently, hospitals throughout Arizona obtain the services of traveling and per diem nursing personnel through nurse staffing agencies.  Traveling and per diem nurse are separate categories of temporary nursing personnel.

53.     Per diem nurses, such as the Plaintiff, are typically local nurses who work on short notice to fill hospitals' immediate needs on a single shift.  In contrast, travel nurses contract to work at hospitals for longer periods, usually thirteen weeks at a time.  Unlike per diem nurses, travel nurses often live outside Arizona and receive short-term housing in Arizona while employed there.  Arizona hospitals purchase the services of travel nurses to satisfy their demand for nursing services, including responding to the influx of seasonal residents, and covering planned absences of regularly employed nursing staff, such as those on maternity leave.  Along with California, Florida, and Texas, Arizona hospitals have the highest demand for travel nursing services.

13

54.     Nurse staffing agencies coordinate most placements of per diem and travel nurses with Arizona hospitals.  Many nurse staffing agencies focus on providing either per diem or travel nurses.  Arizona hospitals pay agencies an hourly bill rate for the work done by the agencies' nursing personnel.  Agencies pass most of that bill rate directly to nursing personnel as wages and benefits, and allocate the balance to their overhead and profit. The compensation of traveling and per diem nurses is directly correlated to the bill rate paid by hospitals to nurse staffing agencies, and a decrease in traveling and per diem nursing agency bill rates results in lower compensation for traveling and per diem nurses.

55.     Dozens of nurse staffing agencies work with hospitals in Arizona.  Before the Registry, Arizona hospitals competed on price with each other to obtain traveling and per diem nursing services from nurse staffing agencies.

56.     Some hospitals use third parties to coordinate their procurement of traveling and per diem nursing personnel from multiple nurse staffing agencies.  Until 2004, the AzHHA Registry was the only major provider of such services in Arizona.

## THE AzHHA REGISTRY

57.     The AzHHA Registry encompasses both per diem and travel nurses and nursing personnel,  including RNs, specialty RNs, LPNs, CNAs, operating room technicians, behavioral health technicians, and sitters.  The AzHHA Registry includes or operates a Per Diem Registry and a Travel Registry.

58.     Since 2000, most of AzHHA's member hospitals have purchased services of traveling and per diem nursing personnel through the AzHHA Registry.  In 2005, 65 Arizona

14

hospitals – controlling the bulk of all hospital beds in Arizona – participated in at least one part of the Registry.    From May 2004 to May 2005, these hospitals purchased approximately 850,000 hours of per diem nursing services (or about $43 million) and approximately 2.3 million hours of travel nursing services (or about $116 million) through the AzHHA Registry.

59.    The AzHHA Registry began in 1988 with a focus on quality assurance.  The Registry sought  to provide quality assurance by establishing standards for agencies' traveling and per diem nursing personnel and agencies' personnel record-keeping requirements.

60.    Hospitals participating in the AzHHA Registry commit to turn first to participating agencies when purchasing traveling and per diem nursing services.  If the participating agencies cannot fill a participating hospital's needs promptly, then a hospital may purchase services from a nonparticipating agency, provided that its total purchases of per diem nursing services from participating agencies remain above 50 percent.   Most hospitals participating in the Registry  have fulfilled this contractual obligation and have purchased most of their traveling and per diem nursing services through the Registry.  Overall, participating hospitals have purchased about 70 percent of their per diem nursing services  through the Registry.  The Travel Registry has accounted for about 90 percent of travel nurse agency sales to hospitals in Arizona.

61.    The participating hospitals regularly meet to select agencies to participate in the AzHHA Registry.  In 2005, the participating hospitals selected approximately 80 different nurse staffing agencies to participate in at least one part of the Registry, out of approximately 170 completed applications.

62.   AzHHA has collected an administrative fee from each agency based on the amount that each agency bills hospitals through the Registry.  For per diem personnel, AzHHA has collected a flat 2 percent fee.  For travel nurses, AzHHA has collected fees based on a tiered structure starting at 2 percent and decreasing to 0.5 percent, depending on the total amount an agency bills participating hospitals.  The fees collected from the agencies fund the Registry and other AzHHA activities.

63.   When the AzHHA Registry began, each participating agency submitted a set of standard bill rates that the agency agreed to charge all participating hospitals.  Starting from the bill rates submitted by an agency, each hospital could then individually negotiate bill rates with each agency.

64.   In 1997, with the support of participating hospitals, AzHHA began collectively setting the maximum rates agencies could bill hospitals through the Per Diem Registry.  To do so, AzHHA began requiring all participating agencies to accept a uniform bill rate schedule, set by the Registry, for all participating hospitals.  In 1998, AzHHA imposed a similar, uniform rate schedule for the Travel Registry.  These actions had the direct and intended effect of artificially stabilizing and suppressing nursing wages.

65.   At the insistence of the CEOs of several participating hospitals, AzHHA employees sometimes prepared and circulated usage reports detailing hospitals' usage of per diem personnel though the Per Diem Registry, and outside it.  The reports included estimates of the cost of hiring per diem personnel outside the Registry.  In May 2002, participating hospitals agreed to expel any hospital using participating agencies for less than 50

16

percent of its total per diem needs.  One system, comprising two hospitals, chose to leave the Per Diem Registry rather than face expulsion.

66.    In 2005, AzHHA altered the Per Diem Registry's rate structure by eliminating the bill rate differential between weekday and weekend shifts.  In addition, AzHHA significantly reduced overtime and holiday bill rates.  AzHHA made these changes over objections from many participating agencies.  Several per diem agencies subsequently left the Registry.

67.    AzHHA has taken other steps to further coordinate how participating hospitals deal with agencies.  The AzHHA Registry contract requires participating agencies to accept certain competitively sensitive contract provisions relating to, among others, payment terms between participating hospitals and participating agencies, indemnification, and cancellation policies.  AzHHA also gathers from and shares with participating hospitals competitively sensitive information such as bonuses offered to traveling and per diem nursing personnel.

68.    In November 2006, while under investigation by the DOJ and the State of Arizona and while defending the *Healthcare Enterprises* suit, AzHHA reverted to its pre-1997 approach to pricing for the Per Diem Registry.  It now requires each agency to submit bill rates that the agency will charge all participating hospitals.  The revised pricing methods applies only to per diem agencies, and AzHHA retains the right to reject an agency's rate submission.  The Travel Registry continues to impose a uniform bill rate schedule applicable to all participating hospitals' purchases from travel nurse staffing agencies.

17

## INTERSTATE COMMERCE

69. The activities of the Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

70. AzHHA has transmitted contracts to nurse staffing agencies across state lines and has communicated with nurse staffing agencies by mail and telephone across state lines. AzHHA employees have traveled across state lines to audit nursing staffing agencies.

71. The Travel Registry contracts with agencies that arrange for nurses to travel from outside Arizona to provide traveling nursing services in Arizona hospitals.

72. Many AzHHA member hospitals that purchase services from nurse staffing agencies through the AzHHA Registry remit substantial payments across state lines to nurse staffing agencies. Nurse staffing agencies also remit substantial payments in the form of administrative fees across state lines to AzHHA.

73. Each of the Hospital Defendants is paid by the United States through Medicare funds that are transmitted across state lines to each such hospital.

74. Each of the Hospital Defendants is paid by insurance carriers and other health care providers located outside Arizona and those payments are transmitted across state lines to each such hospital.

## RELEVANT MARKETS

### A. Hospitals' Purchases of Per Diem Nursing Services

75. Per diem nursing services is a relevant market within the meaning of the antitrust laws.

76. Nurses working as per diem nurses generally do not seek positions as regularly employed RNs at hospitals because those positions do not offer the scheduling flexibility or pay

attractive to per diem nurses.  Many per diem nurses work part-time as secondary wage earners for their families and highly value flexible work schedules.  Per diem nurses generally are paid higher hourly wages compared to regularly employed nursing staff, but typically do not receive benefits such as health insurance or retirement contributions. Although some per diem nurses also work full-time at a hospital, many do not.

77.     Nursing positions in non-hospital settings tend to pay even lower wages, are generally less prestigious, and usually offer less professionally challenging work environments than RN positions in hospitals.  Thus hospital per diem nurse openings are generally more attractive than per diem nurse openings in other settings, such as in-home nursing visits or care, physician offices, freestanding outpatient care facilities, skilled-nursing facilities, schools, and prisons.  Moreover, there are relatively few employment opportunities for per diem nurses in non-hospital settings.

78.     The Defendants, utilizing the Per Diem Registry, have collectively imposed per diem bill rates below competitive levels, and lowered the compensation paid to per diem nurses. Those reduced bill rates have not induced per diem nurses to stop offering their services in sufficient quantities to make the reduction in bill rates unprofitable.  Purchases of per diem nursing services by hospitals is, therefore, a relevant market.

79.     The state of Arizona is a relevant and distinct geographic market, within the meaning of the antitrust laws, for the purchase of per diem nursing services.

### B.  Hospitals' Purchases of Travel Nursing Services in Arizona

80.   Travel nursing services is a relevant market within the meaning of the antitrust laws.

81.   No other nursing position offers the benefits that travel nursing provides: temporary residence in a new or attractive area of the country; the ability to work near friends or relatives in the area; and the chance to try out a hospital for future long-term employment.  Travel nurses usually earn a higher hourly rate than regularly employed nurses, and often receive health benefits and paid vacation from their agency.  Many hospitals in Arizona also pay travel nurses through their agencies bonuses upon completion of their assignments.

82.   The Defendants, utilizing the Travel Registry, have collectively imposed travel bill rates below competitive levels and lowered the compensation to travel nurses.  Those reduced bill rates have not induced travel nurses to stop offering their services in sufficient quantities to make the reduction in bill rates unprofitable.  Purchases of travel nursing services by hospitals in Arizona is, therefore, a relevant market.

83.   Arizona is a relevant geographic market, within the meaning of the antitrust laws, for the purchase of travel nursing services.

84.   Most of the thousands of travel nurses throughout the country have strong preferences for assignments in a particular location at any given time.

85.   Arizona, unlike California and Florida, is a member of the multi-state Nurse Licensure Compact.  This means that nurses licensed in Compact states face lower transaction costs to provide services in Arizona, and incur higher costs when choosing Florida or California instead of Arizona for their thirteen-week travel assignments.

20

86.     Additionally, a substantial number of travel nurses prefer Arizona over other warm-weather locations with high demands for travel nurses, such as Southern California, Texas, and Florida.  Nurses prefer Arizona for any number of reasons, including previous work experience, preferred recreational opportunities, and proximity to friends and relatives.

87.     Travel nurse agencies' experiences in Arizona further corroborate that Arizona is a relevant market for travel nurses.  Starting in 1998, the Travel Registry collectively imposed bill rates in Arizona lower than they would have been absent the Registry, while hospitals in comparable states continued to pay relatively higher bill rates.  That change reduced the hourly wages those agencies paid to travel nurses working in Arizona.  Despite the Travel Registry's adverse effects, travel nurse agencies have not been able to steer a sufficient number of travel nurses to other states to defeat the small but significant nontransitory decrease imposed by the Travel Registry on travel nurse billing rates and wages in Arizona.

88.     For instance, in 1998, one of the nation's largest travel nurse agencies, which provided a substantial number of travel nurses to AzHHA participating hospitals, withdrew from the Travel Registry in response to the collectively imposed bill rates.  Because about 90 percent of travel nursing services sold by travel nurse agencies in Arizona are purchased by hospitals through the Travel Registry, that travel nurse agency was effectively shut out of Arizona hospitals.  The agency found that it could not redirect nurses with preference for Arizona in sufficient numbers to other states, and so lost business to other agencies.

The travel nurse agency was ultimately forced to rejoin the Travel Registry and accept its collectively imposed bill rates.

89.     The Travel Registry has collectively imposed travel bill rates below the competitive levels in Arizona.  Those reduced bill rates have not induced travel nurses to stop offering their travel nursing services in Arizona in sufficient quantities to make the reduction in bill rates unprofitable.

## MARKET POWER

90.     As of 2005, the Arizona hospitals that participated in the Per Diem Registry controlled the vast majority of hospital beds in Arizona.  (The number of hospital beds serves as a proxy for the demand for nursing services.)   As the dominant purchasers of per diem nursing services in Arizona, the hospitals participating in the Registry possessed market power in that relevant market.

91.     As of 2005, the Arizona hospitals that participated in the Travel Registry controlled approximately 78 percent of all hospital beds in Arizona.  As the dominant purchasers of travel nursing services in Arizona, the hospitals participating in the Registry possessed market power in that relevant market.

92.     The high percentage of Arizona hospitals that participate in the AzHHA Registry, including the Hospital Defendants, has allowed the Registry to impose uniform rates and noncompetitive contract terms, despite objections from many large nurse staffing agencies in Arizona, because there are not enough alternative purchasers of per diem and travel nursing services to thwart AzHHA's exercise of market power.  Indeed, according to the DOJ Complaint, the managers of the Registry have recognized that the "more

[hospitals they] can bring into the program the more purchasing power [the hospitals] can have as a group"; and, in communications to its member hospitals, AzHHA executives have "emphasize[d] the importance of functioning as a group," and stressed that the Registry's "strength lies in the group's ability to stay consistent in [its] purchasing decisions when contracting for agency nurses, including travelers."

## ANTICOMPETITIVE EFFECTS

93.  Through the Registry, Defendants and other Participating Hospitals have suppressed, depressed and reduced wages for traveling and per diem nursing personnel below competitive levels.

94.  By AzHHA's own estimate, the AzHHA Registry has forced agency bill rates below competitive levels.  In communications to other state hospital associations and to its own member hospitals, AzHHA has admitted that participating hospitals paid much lower bill rates for traveling and per diem nursing services than they would have paid absent the Registry.  In advertising materials, AzHHA itself has estimated the bill rates its member hospitals paid agencies were up to 12 percent lower than they would have been if agencies had been able to negotiate competitively with hospitals. AzHHA has reported to participating hospitals that the bill rates paid through the Per Diem Registry were 9 percent to 16 percent lower than they otherwise would have been.  (The elimination of shift differentials and reduced overtime and holiday rates imposed since 2005 further lowered the effective per diem agency bill rates.)  In its communications, AzHHA has reported similar savings, 7 percent or more, in the bill rate paid through the Travel Registry.  In sum, AzHHA has estimated that participating hospitals lowered payments to

nurse staffing agencies by $10 million to $12.7 million per year through the reduced bill rates provided by the AzHHA Registry.  Notably, AzHHA has attributed these savings to its collective price-setting and not to any administrative or transactional efficiencies.

95.    Hospitals have recognized that the AzHHA Registry forced agency bill rates below competitive levels.  Indeed, multiple hospitals, including two of the largest hospital systems in Arizona, concluded that leaving the Registry would have  forced them to pay much higher rates for traveling and per diem nursing personnel.  Instances where participating hospitals have left the Registry confirm that hospitals usually have paid higher bill rates outside it.  In the last two years, several hospitals have left the Registry and signed contracts with AzHHA competitors; the new contracts generally have included higher bill rates for agencies.

96.    Traveling and per diem nurse staffing agencies in Arizona have observed that AzHHA forced bill rates below competitive levels.  Agencies that were not part of the Registry, including several former participating agencies, have received higher bill rates from hospitals through arrangements outside the Registry.  A comparison of per diem rates done several years ago by AzHHA showed that the bill rates paid by AzHHA hospitals to agencies operating outside the Per Diem Registry ranged from 5 percent to 40 percent higher than the Registry's rates.  Still, many agencies have continued to participate in the Registry because they feared that failure to do so would effectively exclude them from the Arizona market, namely, the more than 3 million traveling and per diem nursing hours participating hospitals purchase through the Registry each year.  Agencies that left the Registry Program have reported sharp declines in their overall sales.

97.   To maintain agency bill rates below competitive levels, AzHHA has monitored participating hospitals' use of nonparticipating nurse staffing agencies and directed hospitals to increase their purchases of traveling and per diem nursing services through the Registry using the collectively determined, depressed bill rates.  For instance, in March 2000, according to the DOJ Complaint, an AzHHA representative warned hospitals that "[t]he more that non-contract agency usage increased, the less powerful our contract becomes because agencies will drop and follow suit with 'higher bill rate' agencies.  The final result would be the Registry Program ceasing to exist."

98.   As a result of the Registry's lowering bill rates paid to nurse staffing agencies, those agencies have paid traveling and per diem nurses lower wages.  Thus traveling and per diem nurses hired through the Registry have been paid a lower hourly wage than traveling and per diem nurses not hired through the Registry.

99.   The Registry's reduced agency bill rates and the resulting lower traveling and per diem nurse wages likely have distorted the incentives of hospitals and nurses, with significant long-run adverse consequences to the overall supply and mix of nursing services in Arizona.

100.   The AzHHA Registry's depressive impact on nursing wages has not resulted from efficiency-enhancing behavior.

101.   The alleged transactional efficiencies and scale economies AzHHA claims the Registry has generated do not account for, nor are they produced by, the lower bill rates the Registry has imposed on participating agencies.  The anticompetitive effects of the AzHHA Registry have substantially outweighed any alleged transactional efficiencies.

102.   The Registry has not resulted in an increase in the supply of traveling and per diem nurses in Arizona.

103.   AzHHA's imposition of uniform rate schedules and other competitively sensitive contract terms was not necessary to achieve any alleged efficiencies that may have resulted from the Registry's credentialing and quality-assurance activities.   AzHHA conducted its quality-assurance activities for a decade before it began setting uniform bill rates.   Its adoption of uniform rate schedules starting in 1997 did not relate to the Registry's quality-assurance process.   In November 2006, AzHHA ceased imposing uniform agency bill rates through the Per Diem Registry while maintaining the same quality-assurance activities, which reconfirmed that uniform pricing is not necessary to achieve the Registry's quality-assurance goals.

## ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

104.   The agreement among AzHHA,   the Hospital Defendants, and other Participating Hospitals, acting through the AzHHA Registry, has caused and continues to cause:

I.   a material reduction in competition for hospitals' purchases of per diem nursing services in Arizona, and accompanying reductions in bill rates paid to per diem nursing agencies and wages paid to per diem nurses in Arizona; and

ii.   a material reduction in competition for Arizona hospitals' purchases of services provided by travel nurses, and accompanying reductions in bill rates paid to traveling nursing agencies and wages paid to travel nurses in Arizona.

In view of these effects, Defendants' actions have violated, *inter alia*, Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402.

105.   As a consequence of the anticompetitive actions alleged in this Complaint, competition in the markets for per diem nursing services and travel nursing services was substantially harmed, and Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of subcompetitive wages.  The full amount of such damages will be calculated after discovery and upon proof at trial.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Section  1 of the Sherman Antitrust Act, 15 U.S.C. § 1:**
**Unlawful Agreements in Unreasonable Restraint of Trade**

106.   Plaintiff incorporates by reference all preceding allegations as if set forth in full herein.

107.   AzHHA, the Hospital Defendants, and other Participating Hospitals, acting through the AzHHA Registry Program, agreed to fix certain terms and conditions relating to the purchase of the services of traveling and per diem nursing personnel, including traveling and per diem nurse staffing agency bill rates.

108.   Defendants have engaged in an unlawful combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

109.   Defendants' agreement and conduct constitutes a *per se* violation of Section 1 of the Sherman Act.

27

110.    As set forth above, on information and belief, in violation of Section 1 of the Sherman Act, Defendants entered into exclusionary agreements in unreasonable restraint of trade that prevented Plaintiff and members of the proposed Class from being paid full market rates for their labor.

111.    These agreements were an unreasonable restraint of trade and affected trade in interstate commerce.

112.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.   The injury to Plaintiff and the Class consists of receiving lower wages for their work than they would have received in a free and open market for their services.  Such injury, in the form of artificial reduction in wages, is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.  Pursuant to 15 U.S.C. §15(a), the damages recoverable for the injury suffered by Plaintiff and the Class shall be trebled.

## COUNT II

**Violation of Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402**

113.    Plaintiff incorporates by reference all preceding allegations as if set forth in full herein.

114.    Defendants and other Participating Hospitals have engaged in an unlawful combination, or conspiracy in unreasonable restraint of trade in violation of Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402.

115.    As set forth above, on information and belief, in violation of Section 44-1402 of Arizona's Uniform State Antitrust Act, Defendants entered into agreements in

unreasonable restraint of trade that prevented Plaintiff and members of the proposed Class from being paid full market rates for their labor.

116.    These agreements were an unreasonable restraint of trade and affected trade in interstate commerce.

117.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.   The injury to Plaintiff and the Class consists of receiving lower wages for their work than they would have received in a free and open market for their services.  Such injury, in the form of artificially reduced wages, is of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.  Defendants' conduct in causing the injury was flagrant, entitling Plaintiff and the Class to treble damages.

## COUNT III

**Violation of Arizona Law: Interference With Business Expectancy**

118.    Plaintiff incorporates by reference all preceding allegations as if set forth in full herein.

119.    Defendants and other Participating Hospitals have employed improper means, which include antitrust violations, to interfere with the business interests of Plaintiff and members of the Class, including their interest in receiving free market wages.

120.    Defendants and other Participating Hospitals intended to create or continue illegal restraint of competition when interfering with the business interests of Plaintiff and members of Class, including their interest in receiving market wages.

121.    Defendants and other Participating Hospitals intended to advance their own interests by suppressing competition for traveling and per diem nurses' wages when interfering with

the business interests of Plaintiff and members of the Class, including their interest in receiving market wages.

122. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff and the Class have suffered injury by receiving less than free market wages.

123. Defendants and other Participating Hospitals, by suppressing the wages of traveling and per diem nurses, acted to serve their own interests, knew, or had reason to know, and consciously disregarded a substantial risk that their conduct might significantly injure the rights of traveling and per diem nurses.

## COUNT IV

### Violation of Arizona Law: Unfair Competition

124. Plaintiff incorporates by reference all preceding allegations as if set forth in full herein.

125. Defendants and other Participating Hospitals have engaged in unfair competition, which includes antitrust violations and other acts or practices actionable under federal or state statutes.

126. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff and the Class have suffered injury by receiving less than free market wages.

127. Defendants and  other Participating Hospitals, by suppressing the wages of traveling and per diem nurses, acted to serve their own interests, knew, or had reason to know, and consciously disregarded a substantial risk that their conduct might significantly injure the rights of traveling and per diem nurses.

## COUNT V

### Violation of Arizona Law: Unjust Enrichment

128.    Plaintiff incorporates by reference all preceding allegations as if set forth in full herein.

129.    Defendants and other Participating Hospitals were unjustly enriched by their suppression of the wages of traveling and per diem nurses and Defendants are obliged to make compensation for the excess benefits they unjustly received.

130.    Defendants and other Participating Hospitals, by suppressing the wages of traveling and per diem nurses, acted to serve their own interests, knew, or had reason to know, and consciously disregarded a substantial risk that their conduct might significantly injure the rights of traveling and per diem nurses.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following:

A.    That the Court certify this case as a class action, and approve the Class as proposed;

B.    Judgment in favor of herself and the Class she seeks to represent and against Defendants, and each of them, jointly and severally, for damages, measured as the underpayments to Plaintiff and the other members of the Class as a result of Defendants' anticompetitive conduct;

C.    Under Counts I and II, for trebling of such damages;

D.    Pre- and post-judgment interest;

E.    Injunctive relief to prevent further anticompetitive conduct;

31

F.      Costs of suit, including reasonable attorneys' fees for Counts I and II, pursuant to

15 U.S.C. §15(a) and ARS §§44-1408 (B), respectively;

G.      Punitive damages under Counts III, IV, and V; and,

H.      Such other and additional relief as the Court deems reasonable and just.

### **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: July 2, 2007

<div style="margin-left:40%">

**KELLER ROHRBACK, P.L.C.**


By:      /s/ Mark D. Samson
Mark Samson (State Bar No. 011076)
Ron Kilgard (State Bar No. 005902)
3101 North Central Avenue, Suite 1400
Phoenix, Arizona  85012
Tel: 602-230-6324
Fax: 602-230-6360

**BERGER & MONTAGUE, P.C.**
David F. Sorensen
Eric L. Cramer
John D. Radice
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

**GARWIN GERSTEIN & FISHER, LLP**
Barry S. Taus
1501 Broadway
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

</div>

**ODOM & DES ROCHES, LLP**
Stuart E. Des Roches
Poydras Center
650 Poydras Street, Suite 2020
New Orleans, Louisiana 70130
Tel: 504-522-0077
Fax: 504-522-0078

**KAPLAN FOX & KILSHEIMER, LLP**
Linda P. Nussbaum
805 Third Avenue
New York, NY 10022
Tel: 212.687.1980
Fax: 212.687.7714


**PERCY, SMITH & FOOTE**
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA  71309


*Attorneys for Plaintiff*